Brady, J.
Plaintiff St. Paul Village Condominium Association (the Association) seeks to recover for a water damage loss under an insurance policy issued to the Association by St. Paul Fire and Marine Insurance Company (the Insurer). The Association has asserted claims against the Insurer for breach of contract and declaratory judgment (Count I), and for *377 unfair settlement practices in violation of G.L.c. 93A and c. 176D (Count II). The Association now seeks partial summary judgment as to Count I and as to liability on Count II. The Insurer has filed a crossmotion for summary judgment as to all claims against it. For the following reasons, the Association’s motion is DENIED and the Insurer’s crossmotion is DENIED.
BACKGROUND
The following undisputed facts are derived from the summary judgment record. The Association’s condominium complex is a multi-unit residential complex at 33-39 St. Paul Street in Brookline, Massachusetts. On December 6, 1992, two basement units were damaged by water and steam escaping from corroded steam lines located under the concrete flooring. The damage to the two units included the hardwood floors and painted walls. The Association had a property insurance policy issued by the Insurer, effective June 3, 1992 through June 3, 1993, insuring “covered property against risks of direct physical loss or damage except for those excluded in the Property Exclusions— Losses We Won’t Cover section.” The policy contained Community Association Package Coverage (Package Coverage) that included “all-in” replacement cost coverage for the interior of the units and fixtures, for which the Insurer was to pay the smallest of three listed methods of calculation[1] for “the cost of repairing or replacing the damaged property without deduction for depreciation.” If property was not actually replaced, then the Insurer was to pay the actual cash value of the loss, the depreciated value of the damaged property. Under the “Property Exclusions — Losses We Won’t Cover” section of the Package Coverage, the policy provides that the Insurer “won’t cover loss that results if water or steam leaks from a plumbing, heating, air conditioning system or household appliance over an extended period of time,” and “won’t cover loss caused or made worse by . .. deterioration, mold, wet or diy rot, rust or corrosion ...” The parties do not dispute that the cost of repairing or replacing the steam pipes themselves is not covered under the Package Coverage portion of the policy.
Also included in the policy was “Difference in Conditions” coverage (DIC Coverage), which operates to “include!] certain causes of physical loss or damage that aren’t covered under [the Package Coverage].” Under the DIC Coverage, the Insurer agreed to “protect covered property against risks of direct physical loss or damage except those excluded in the Exclusions— Losses Not Covered section,” and to pay the smallest of two listed methods of calculation[2] for “the cost of repairing or replacing the damaged property without deduction for depreciation;” or the Association may have elected to receive instead the actual cash value of the loss, the depreciated value of the damaged property. Under the Exclusions — Losses Not Covered section," the policy provides that the Insurer “won’t cover loss caused or made worse by . . . deterioration, mold, wet or dry rot, rust or corrosion . . .” or “loss to a . . . steam pipe . . . when the loss is caused by any condition or event within such equipment.”
The Association notified the Insurer of the loss on December 10, 1992, and the Insurer’s Senior Claims Adjuster, Ron Fonteneau (Fonteneau), visited the site that same day. Fonteneau met with the Association’s property manager, Ron Cronin (Cronin), and inspected one unit,[3] where Fonteneau took measurements and photographed the damage. Fonteneau determined that the only damaged property subject to depreciation were the hardwood floors and painted walls. The following day, Fonteneau sent Cronin a written “loss estimate.” Cronin then notified him of the damage to the second unit. Fonteneau revisited the site, inspected the damage to the second unit, took measurements and photographed the damage. Fonteneau saw damage similar to that in the first unit, and again determined that the only damaged property subject to depreciation were the hardwood floors and painted walls. Fonteneau sent Cronin a second written “loss estimate.”
Fonteneau determined that the total replacement cost for the damaged property in both units was $20,939.83, including a depreciation “holdback” of $4,332.40. After applying the $1,000.00 deductible and allowing a $600.00 “concession,” the Insurer issued a check in the amount of $15,660.43 to the Association. The Insurer also sent a “Proof of Loss and Holdback agreement” to be executed by the Association, but the Association did not sign or return this agreement. The parties appear to agree that Fonteneau told Cronin that upon completion of the repairs and a physical inspection by the Insurer to demonstrate that the funds paid had been expended to repair the damage, the Insurer would release the “holdback” funds.
Shortly thereafter, Art Sarcione, a public adjuster retained by the Association, submitted his repair estimate of $51,990.64 to the Insurer. The parties then met and agreed to a revised replacement cost of $32,403.83,[4] from which the Insurer deducted the $4,332.40 “holdback,” the $1,000.00 deductible, and the $15,550.43 previously paid, and in February 1993, sent to the Association a second check for the remaining $11,411.00 actual cash value. The Insurer again sent a “Proof of Loss and Holdback agreement," for execution by the Association.
The Association undertook the repairs, and notified the Insurer. In April, 1993, Fonteneau visited the site and inspected the repairs to one unit,[5] where he noticed that the hardwood floors had been replaced with wall-to-wall carpeting. The Association did return the second “Proof of Loss and Holdback agreement,” signed, but made subject to the Insurer’s payment of the $4,332.40 “holdback” by May 12, 1993. In May or June, 1993, the Association submitted invoices total-ling over $40,000.00 intended to document repairs to *378 the property, and requested payment of the $4,332.40 “holdback.” The parties agree that the Association did not allocate the expenses between property that was and was not covered under the policy. Further, the Insurer does not dispute the Association’s assertion that it actually paid these invoices, but maintains that not all of the payments related to “covered, damaged property.”[6] Fonteneau determined that the Association had spent only $22,090.98 (including $2,000.00 for carpeting) to repair or replace damaged property that was covered under the policy; the balance had been spent to upgrade or repair property that he deemed to be either not covered by the policy or not damaged in the loss. Fonteneau informed the Association that the Insurer would not pay the $4,332.40 “holdback” because the Association had not spent the agreed-upon $32,403.83 to repair the damaged property covered under the policy. The Insurer later agreed to pay $232.50 of the “holdback” amount, but this payment was never made.
The Association sent a demand letter to the Insurer on August 31, 1993, and initiated this action on November 17, 1993, alleging breach of contract for the Insurer’s refusal to pay for the loss, and claiming that the Insurer violated G.L.c. 93A in its refusal to pay the $4,332.40 “holdback” amount that the Association maintains is due under the policy.
DISCUSSION
I. Motions to strike.
The Association seeks to strike portions of the affidavits of Fonteneau, Katharine Zupan (Zupan) and William Reed (Reed), submitted by the Insurer. The Insurer contends that the affidavit of Marvin Milton (Milton) must also be stricken.
To the extent that any of the affidavits present facts that are material to the summary judgment motions, the court agrees that bare assertions and conclusions regarding the affiant’s understandings, beliefs and assumptions are unacceptable in a summary judgment affidavit, as are hearsay statements, general denials and factual allegations not based on personal knowledge. See Madsen v. Erwin, 395 Mass. 715, 721 (1985); Key Capital Corp. v. M&S Liquidating Corp.. 27 Mass.App.Ct. 721, 728, rev. den. 406 Mass. 1101 (1989). Additionally, a party cannot attempt to create a factual dispute by the expedient of contradicting by affidavit statements previously made under oath at deposition. O’Brien v. Analog Devices, Inc., 34 Mass.App.Ct. 905, 906 (1993); Spilios v. Cohen, 38 Mass.App.Ct. 338, 341 n.2 (1995). Further, while a party may resist discovery on the basis of privilege, a waiver on the virtual eve of trial is insufficient to allow his adversary time within which to discover the communications and information, and, depending on the circumstances, may justify an order barring the use of privileged evidence. G.S. Enterprises, Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 270-71 (1991).
The court has reviewed the Fonteneau affidavit and concludes that it is based on personal knowledge and is not contradictory to matters testified to during his deposition. However, the court will disregard the affidavit to the extent that it asserts legal conclusions (e.g., paras. 23 and 24). Finally, looking at the totality of the circumstances, the court cannot say that the Association was prejudiced by the Insurer’s delay in disclosing Fonteneau’s letter of June 18, 1993. The Association had six months to pursue further discovery, from October 19, 1995, when it was served with a copy of the objected-to letter from Fonteneau to Reed, until April 22, 1996, when it was notified that arguments on the motions were scheduled for May 7, 1996.
Because the court need not rely upon the Zupan and Reed affidavits in ruling on the summary judgment motions, the court will deny the Association’s motion to strike. Further, the court notes that an objection to an affidavit as “self-serving” is not a ground for striking statements.
Finally, as to the Milton affidavit, the court will disregard any portion of the affidavit concerning Milton’s understandings (see paras. 2, 3, and 4(e)).
II. The motions for summary judgment.
This court will grant summary judgment where there are no genuine issues of material fact and where the summary judgment record entitles the moving party to judgment as a matter of law. Community Nat'l Bank v. Dawes, 369 Mass. 550, 553 (1976); Cassesso v. Comm'r of Correction, 390 Mass. 419, 422 (1983). A moving party who does not bear the burden of proof at trial must affirmatively demonstrate the absence of a triable issue, and that the summary judgment record entitles them to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989).
a. interpretation of the policy language.
1. replacement cost coverage under the Package Coverage.
The parties disagree as to whether the language of the Package Coverage portion of the policy does or does not require that the loss funds be spent on “covered property” in order to be considered to have been spent on the repair or replacement of damaged property. The Association takes the position that the language in the Package Coverage portion of the policy is clear and unambiguous, and does not require that “the insured’s replacement of ‘damaged or destroyed property’ be limited to ‘covered property.’ ” The Insurer agrees that the language is unambiguous, and contends that the Association is instead entitled to only $22,090.98, the amount actually expended on repairs to “covered, damaged property.”
This court will grant summary judgment to the party entitled to judgment as a matter of law if both parties have moved for summary judgment and “there is no real dispute [concerning] the salient facts” or if *379 the case involves only a question of law. Cassesso v. Comm’r of Correction, supra. A dispute concerning the proper interpretation of an insurance contract generally raises only a question of law. Somerset Savings Bank v. Chicago Title Insurance Co., 420 Mass. 422, 427 (1995). Where the words of an insurance contract are plain and free from ambiguity they must be construed in their usual and ordinary sense, according to the fair meaning of the language used as applied to the subject matter. Jacobs v. United States Fidelity & Guaranty Co., 417 Mass. 75, 76-77 (1994). Ambiguity in the language of an insurance contract is not created simply because a controversy exists between the parties, each favoring an interpretation contrary to the other. Lumbermens Mut. Cas. Co. v. Offices Unlimited, Inc., 419 Mass. 462, 466 (1995). The court agrees that the policy language in question, set forth in footnotes 1 and 2 above, is free from ambiguity.
In construing the insurance contract, the court may consider what an objectively reasonable insured, reading the relevant policy language, would expect to be covered. Hazen Paper Co. v. United States Fidelity & Guaranty Co., 407 Mass. 689, 700 (1990). However, the words in question cannot be segregated for construction from the rest of the insurance contract. Trustees, Thayer Acad. v. Royal Exch. Assur., 281 Mass. 150, 155 (1932). The Association urges that because the replacement cost coverage provision in the Package Coverage provides that the Insurer will pay for the amount spent “in repairing or replacing the property," there is no requirement that the Association have spent the funds to repair or replace damaged property, or even property covered under the policy. The Association’s strained reading of this provision is not objectively reasonable. Reading the straight-forward language of policy as a whole, an insured could reasonably expect to be paid only for repairing or replacing, or for the actual cash value of, property covered by the policy, that was damaged by a direct physical loss.
The court concludes that the Insurer’s reading of the same provision is objectively reasonable. An objectively reasonable insured could expect to be paid for the cost of repairing or replacing property covered by the policy that was damaged by a direct physical loss or damage, or if the insured did not replace the damaged property with property of similar kind and quality, to receive the actual cash value of the covered, damaged property. Here, the Association could reasonably expect to be paid the amount actually spent (but not to exceed the replacement value) in repairing or replacing the property covered by the policy that was damaged by a direct physical loss or damage; or if not repaired or replaced with property of similar kind and quality, the actual cash value of the damaged, covered property. For instance, if carpeting is similar in kind and quality to wood flooring, then the Association may reasonably expect to receive the amount actually spent to replace the damaged wood flooring; if the two materials are not similar in kind and quality, then the Association may reasonably expect to receive the actual cash value of the damaged wood flooring.
2. the DIC Coverage.
Next, the Association argues that even if the Package Coverage portion of the policy does not provide coverage for the expenditures made, including repair or replacement or the steam pipes, then the language of the DIC Coverage operates to grant coverage.[7] The Insurer responds that the DIC Coverage does not apply to the Association’s loss because this loss was covered under the Package Coverage; by its terms, the DIC Coverage operates only to “included certain causes of physical loss or damage that aren’t covered under [the Package Coverage].”
The court rules that an objectively reasonable insured, reading the relevant policy language, could not expect the steam pipes themselves to be covered. See Hazen Paper Co. v. United States Fidelity & Guaranty Co., supra. The loss to the steam pipes was not covered under the Package Coverage because the policy does not cover “loss caused or made worse by . . . corrosion.” However, the plain and unambiguous language of the DIC Coverage also excludes the loss to the steam pipes (the policy does not cover “loss caused or made worse by... corrosion ...” or “loss to a .. . steam pipe . . . when the loss is caused by any condition or event within such equipment”). The court rules that the DIC Coverage portion of the policy is inapplicable to this dispute.
b. the amount due under the policy.
The Association has submitted evidence to show that it has spent over $40,000.00 on repairs to the property, and contends that it is entitled to the “hold-back” amount under the policy. The Insurer, on the other hand, has submitted evidence to show that only $22,090.98 was expended to repair or replace covered, damaged property. Although the Insurer has made payments to the Association in an amount equal to the amount that it determined to be the actual cash value of the damaged, covered property, summary judgment is inappropriate because the materials in the record raise a factual issue concerning the amount of the $4,332.40 “holdback,” if any, that is payable under the policy, when interpreted in accordance with the discussion under Part II.a, above.
c. the claim under G.L.c. 93A.
Finally, the Insurer seeks summary judgment on Count II of the Amended Complaint, alleging violations of G.L.c. 93A and c. 176D. The Insurer argues that the Association, as a business plaintiff, must bring its action under G.L.c. 93A, §11, but no claim lies under §11 for an alleged violation of G.L.c. 176D. Even if the Association could proceed as a consumer plaintiff under G.L.c. 93A, §9, the Insurer’s argument contin *380 ues, the Association has failed to produce any evidence to show any violation of G.L.c. 176D.
To make the determination whether a transaction took place in a “business context,” such that the plaintiff must bring its action under G.L.c. 93A, §11, the court must consider the character of the party, the nature of the transaction, the activities engaged in by the parly, and whether the transaction was motivated by business or personal reasons. Begelfer v. Najarian, 381 Mass. 177, 191 (1980); Poznik v. Massachusetts Medical Professional Insurance Association, 417 Mass. 48, 52 (1994). Here, the Association is a residential condominium association that purchased property insurance coverage to protect the owners’ individual and common interests. Whether plaintiffs were engaged in trade or commerce is a question for the trier of fact, Brown v. Gerstein, 17 Mass.App.Ct. 558, 570-71 (1984), and will not be decided by the court on summary judgment.
Further, even if the Association were found to be a business plaintiff, the Insurer misplaces its reliance on Jet Line Services, Inc. v. American Employers Ins. Co., 404 Mass. 706 (1989), to support its position that unfair insurance settlement practices, which would violate c. 176D if proven, are not actionable under G.L.c. 93A, §11. See also DiVenuti v. Reardon, 37 Mass.App.Ct. 73, 79 (1994) (noting that “a violation of G.L.c. 176D, §3(9) does not support a §11 claim under c. 93A,” citing Jet Line Services, Inc.). In Polaroid Corp. v. The Travelers Indemnity Co., 414 Mass. 747 (1993), the Supreme Judicial Court indicated there might be an independent c. 93A, §11 claim for unfair and deceptive acts by an insurance company even though this same conduct would give rise to an action under c. 176D, §3(9). The Court there said that a “claim that G.L.c. 93A, §11, was violated by [an] insurers’ violations of certain provisions of G.L.c. 176D, §3(9), is of significance only to the extent that the alleged wrongful conduct was a violation of G.L.c. 93A, §2,” and “a consumer asserting a claim under c. 93A, §9 may recover for violations of c. 176D, §3(9) without regard to whether the violations were unlawful under c. 93A, §2 . . .” Id. at 754.[8] Thus, the Court implied that there can be a cause of action against an insurer under §§2 and 11 which is independent of any c. 176D violation. Even so, not every unlawful act is automatically unfair or deceptive under c. 93A, §2, and the court must focus on the nature of the challenged conduct and on the purpose and effect of that conduct. Massachusetts Employers Insurance Exchange v. Propac-Mass, Inc., 420 Mass. 39, 42 (1995). In short, even in a commercial dispute between business organizations, a violation of c. 176D that rises to a level so as to constitute an unfair or deceptive act for purposes of c. 93A, §2, would seem to support an independent claim for violation of c. 93A, §11.
In light of the factual disputes regarding the amount of the “holdback” that is payable under the Package Coverage, as discussed in Part Il.b, above, and in light of the Insurer’s refusal to pay a portion of the “holdback” that it conceded was due, the court concludes that summary judgment is inappropriate as to Count II, as well.
ORDER
For the foregoing reasons, it is hereby ORDERED that the parties’ crossmotions for summary judgment are DENIED. It is further ORDERED that, after trial and at the time of judgment, a declaration shall enter declaring that:
1) under the Package Coverage portion of the policy the Association is entitled to be paid for the amount that it actually spent (but not to exceed the replacement value) in repairing or replacing the property covered by the policy that was damaged by a direct physical loss or damage; or if not repaired or replaced with property of similar kind and quality, the actual cash value of the damaged, covered property; and
2) the Difference In Conditions (DIC) coverage portion of the policy is inapplicable to this dispute.

The parties agree that a key to their dispute is the proper interpretation of the language highlighted below. The relevant language in the Package Coverage portion of the policy reads: “Replacement cost coverage. Unless otherwise indicated, we’ll pay the cost of repairing or replacing the damaged property without deduction for depreciation. But we won’t pay more than the smallest of the following:
-the limit of coverage that applies to the property;

-the amount you actually spend in repairing or replacing the property with property of similar kind and quality;

-the amount it would cost to replace the damaged or destroyed property at the time of loss with new property of similar kind and quality to be used for the same purpose on the same site.
You don’t have to replace property on the same site. But we won’t pay on a replacement cost basis until property has actually been replaced ... If the property isn’t replaced for any [of three listed reasons, none of which is applicable here], we’ll pay you on an actual cash value basis. If you decide not to replace the property, you must tell us of your decision within 180 days of the loss." (Emphasis supplied.)

The relevant language in the DIC Coverage portion of the policy reads: “Property insured for replacement cost. We’ll pay the cost of repairing or replacing the damaged property without deduction for depreciation. But we won’t pay more than the smallest of the following:
-the limit of coverage that applies to the property;
-the amount you actually spend in repairing the damage, or the amount it would cost to replace the damaged property at the time of the loss with new property of similar kind and quality to be used for the same purpose on the same site.
We won’t pay for replacement cost basis until property has actually been replaced ... If your coverage is written for replacement cost, you can choose to have your loss figured according to replacement cost or the actual cash value of the property. And, even if you first choose to have your loss figured on an actual cash value basis, you can change your mind by letting us know in writing within 180 days from the time of the loss."

Apparenüy, the Association was not yet aware of the damage to the second unit.

The Association takes inconsistent positions on this issue. On one hand, the Association alleges that the public adjuster and Insurer’s adjuster “agreed that [the] Association had sustained replacement cost damage in the amount of at least $32,403.83 as a result of the water damage.” See Amended Complaint at para. 6. Next, the Association states that “Following a meeting between the Insurer’s adjuster and the Association’s public adjuster in February 1993, the parties agreed to a revised replacement cost figure of $32,403.83.” See Memorandum in Support of Plaintiffs Motion for Partial Summary Judgment at 3. On the other hand, the Association later takes the position that no such agreement was made, but merely an “agreement to agree.” See Plaintiffs Memorandum in Opposition to [the Insurer’s] Cross-motion for Summary Judgment at 4:

The parties disagree as to the reason that Fonteneau did not inspect the second unit.

The Insurer refers to as “covered, damaged property” the property that it considers to be insured against risk of loss under the policy, that was damaged by a covered loss.

The Association points to a section that provides that underground pipes are not covered under the Package Coverage and notes that the DIC Coverage contains no such exclusion.

A violation of c. 176D, §3(9), automatically comprises a violation of c. 93A, §9, because §9 so provides. Other cases have considered whether a violation of c. 176D, §3(9) gives rise to a claim under c. 93A, §§2 and 11, see Transamerica Ins. Group v. Turner Construction Co., 33 Mass.App.Ct. 446, 452 (1992) and DiVenuti v. Reardon, supra, 37 Mass.App.Ct. at 79, but these cases do not necessarily stand for the proposition that a violation of G.L.c. 176D, §3(9) can never support a §11 claim under c. 93A. Transameríca Ins. Group was decided on an agreed statement of facts, and DiVenuti was decided following trial. The cases may therefore be viewed in light of Polaroid Corp. v. The Travelers Indemnity Co., supra, as deciding only that, on the particular facts before them, “mere” c. 176D violations, i.e., those not rising to the level of §2 violations, did not support a §11 claim.